JEAN BAPTISTE DUPEYRE *v.* THE WESTERN MARINE AND FIRE INSURANCE COMPANY.

Seaworthiness is an implied warranty in every contract of insurance. It is a condition precedent, without which the liability of the insurers cannot exist, although the unseaworthiness may result from some vice or defect unknown to the insured.

Where a vessel is lost in consequence of some of the perils insured against, the presumption is in favor of her seaworthiness; and it is incumbent on the underwriters to show that this warranty has not been complied with. But where a loss occurs, which cannot be ascribed to stress of weather, or accident, the presumption will be that the vessel was not seaworthy; and the burden of proof must be on the in-' sured.

A policy of insurance protects against extraordinary accidents and perils; but cannot be considered as securing indemnity for natural decay and ordinary wear and tear.

The party insured will be responsible for any loss, occasioned by want of proper care on the part of his agents.

Although, generally, the warranty of seaworthiness refers to the commencement of the risk, the fact of being seaworthy then, does not satisfy the warranty. The vessel must be kept in a seaworthy condition, or restored to it in the successive stages of the voyage, so far as it depends on the insured or his agents.

APPEAL from the District Court of the First District, *Buchanan, J.*

MORPHY, J. This action is brought to recover $8000, on a policy of insurance on the steamboat St. Léon. The insurance was for six months from the date of the policy, and the loss happened on the day before the expiration of that time. The defence set up by the underwriters is, that during the existence of the policy, and at the time of the loss, the St. Léon was unseaworthy, and that she was not lost by a peril insured against. The case was tried by the court below, without the intervention of a jury. There being a judgment for the plaintiff, the defendants have appealed.

By the policy, which is in the usual form, the St. Léon was to run as a ferry boat between this city and the opposite side of the river, with liberty to tow vessels up and down the river to the distance of about fifty miles, and to run to the mouth of the Mississippi river, and about one hundred miles up the river above New Orleans. The adventures and perils insured against by this policy *are of the sea, river,* and fire, and all that have or shall come

to the hurt, detriment, or damage of the said steamboat, engine, or any part thereof. The account given by the witnesses of the loss of this boat, agrees with plaintiff's own showing in his petition. It appears that on the 12th of September, 1839, the boat had proceeded to La Croix' plantation, about three leagues down the coast, to bring up some sick person. That about three o'clock P. M. of the same day, she returned, landed her passengers on the other side of the river, and was then brought to, and properly secured at the usual ferry landing place. The evening was a fine and calm one. At the usual hour the hands went to rest, with the exception of one Nadal, who had the watch. Nothing occurred until half past nine o'clock, when the latter discovered that the boat had sprung a leak, and was filling very rapidly. He immediately gave the alarm, and, notwithstanding all possible exertions on the part of the master and hands, who immediately assembled, the boat sunk shortly after. The petition does not allege, nor does the evidence show any stress of weather before, or at the time of the loss of the boat, nor any accident or circumstance arising from the perils insured against, which could immediately or remotely have occasioned such loss.

Seaworthiness is an implied warranty in every contract of insurance. It is a condition precedent without which the liability of of the insurers cannot exist, although the unseaworthiness may arise from some inherent vice or latent defect unknown to the assured. When a vessel is lost in consequence of some of the perils insured against, the presumption is in favor of her seaworthiness, and it is incumbent upon the underwriters to show that this warranty has not been complied with ; but when, as in the present case, a loss occurs which cannot be ascribed to stress of weather, or to any accident which might by possibility have produced it, the fair and natural presumption is, that the vessel was defective and not seaworthy, and the burden of proving that, in fact, she was seaworthy is then thrown on the insured. 1 Philips on Insurance, 308, 324. 1st Condy's Marshall, 158. The whole evidence adduced by both parties on this head, when taken together, rather strengthens than destroys the presumption of law arising from the circumstances of the loss in this case. ' The witnesses for the defendants, some of whom are inspectors of Insurance Companies,

shipbuilders, &c., have declared that, upon a thorough examination of the St. Léon, when she was hauled out of the water and placed on the ways, she was found to be absolutely rotten and unsound in her most essential parts. That her plank and timbers were so decayed that they came to pieces. That she was unfit for repairs, and, in their opinion, could not have been seaworthy at the time she sunk, nor for several months before. That she had been built with common western oak some time in 1833, and that boats constructed with this wood seldom last six years. That they rot on the Mississippi sometimes in about three years, sometimes in less time. This testimony is partially confirmed by some of plaintiff's witnesses, while it is contradicted by the others, who testify that the St. Léon was not absolutely unsound. That she was in every respect fit to act as a ferry boat in the river. That she had been remarkably well built, and had been repaired eighteen months before she sunk. That the plaintiff was extremely careful and attentive in making the necessary repairs to his boats, &c. With the evidence before us, and in the absence of any apparent cause arising from the perils insured against, the loss can hardly be ascribed to any other cause than the general rottenness of the boat, the usual wear and decay gradually rendering her unfit for the uses to which she had been put. A policy of insurance is a protection against extraordinary accidents and perils, but never was nor can be understood to secure an indemnity for natural decay and ordinary wear and tear. 1 Phillips, 625—627. 8 Peters, 583—585. But it is said that there are different degrees of seaworthiness. That a vessel which may not be considered sufficiently staunch for the stormy and hazardous navigation of the ocean, may with safety navigate a river; and that this boat is represented by some of the witnesses as fit for the employment she was in. Admitting that, by reason of the light duties she had to perform as a ferry boat, we could consider her as strictly seaworthy in relation to her general condition, there is a circumstance which has not been much relied on in argument, but which, alone, would be sufficient to prevent the plaintiff from recovering.

All the witnesses speak of a hole which they saw in the bottom of the boat, when she was hauled out of the water. This hole, they say, was made to insert the pipe of the cold water pump,

which all steamboats are obliged to have, to supply their boilers with water. The plug to stop the hole was not in it. If not properly secured, this plug is apt to drop out, or be displaced. If such a thing happens, a boat may sink in twenty minutes according to one witness, or in two hours according to others. Ames, one of the plaintiff's witnesses and his engineer, says that he had attached to the boat her cold water pump some three years before she sunk. That five or six days before the loss, finding that she leaked considerably at the plug, and fearing she might sink from it, he took it out and fixed it, and took the pipe to the coppersmith to have it mended. That he supposes it was not over three quarters of an hour after the alarm was given, that the boat sunk. The evidence renders it extremely probable, and such appears to have been the opinion of the plaintiff himself, that the loss happened in consequence of the plug getting out of the hole. It is not pretended or proved that the plug was displaced by any accident arising from the perils insured against. It could not have dropped out during the trip performed in the course of the day, because the witnesses say it would have sunk her in less than an hour. It must have happened long after the boat was moored in still water and calm weather to the bank of the river. The plug must have been insufficiently secured. The loss, then, was owing to the want of proper care on the part of the agents of the assured, and he must be responsible for their acts. 1 Philips, 589, *et seq.* 13 L. 524. If it be true, moreover, that all steamboats must at all times be provided with this cold water pump to supply their boilers with water, the St. Léon cannot be considered to have been in a state of seaworthiness at the time of the loss, as she was without this pump, which is said to be necessary for the safe and secure navigation of boats propelled by steam. If, instead of a plug carelessly screwed, the St. Léon had had a water pump, the water would have risen in the pipe to the level of the river, and there could have been no danger or accident on that score. Although, in general, the warranty of seaworthiness refers to the commencement of the risk, the mere fact of a vessel being then seaworthy does not satisfy the warranty. She must be kept in a seaworthy condition, or restored to it in the successive stages of the voyage, as far as depends on the insured or his agents.

1 Philips, 325. This of itself might be considered as a breach of the warranty of seaworthiness, sufficient to avoid the policy.

It is, therefore, ordered that the judgment of the District Court be reversed, and that ours be for the defendants, with costs in both courts.

᾿ *Canon*, for the plaintiff.

*Maybin*, for the appellants.